J-S30033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF DEBORAH J. BONIFACE, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: CHRISTOPHER BONIFACE | : : : : : : | |
| | : | No. 164 MDA 2024 |

Appeal from the Order Entered January 2, 2024
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  01150 of 2021

BEFORE:   PANELLA, P.J.E., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: SEPTEMBER 20, 2024**

Appellant Christopher Boniface appeals from the order entered in the Court of Common Pleas of Lancaster County Orphans' Court dismissing his notice of election to take against the Will of Deborah J. Boniface ("Decedent") and directing the forfeiture of his spousal interest to an elective share of Decedent's estate.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows:  In December of 2001, Decedent and Appellant married, and on December 8, 2018, they separated.  On January 19, 2019, Appellant filed a divorce petition.  On

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We note that an appeal may be taken as of right from an order entered in the Orphans' Court determining an interest in real or personal property.  ***See*** Pa.R.A.P. 342(a)(6).

January 31, 2019, Decedent executed her Last Will and Testament ("Will") naming as executrix her niece, Jessie A. Beiler ("the Executrix"), and leaving the entirety of her estate to her. Decedent specifically indicated she "make[s] no provisions for [her] husband, [Appellant], for reasons best known by [her]." Will, executed 1/31/29, at 1.

Decedent died on February 16, 2021, and on May 5, 2021, the Executrix filed a petition for letters testamentary. Letters testamentary were granted on July 7, 2021, and on August 13, 2021, Appellant filed a notice to take against the Will seeking his elective share of Decedent's estate pursuant to 20 Pa.C.S.A. § 2203.

On January 28, 2022, the Executrix filed a petition objecting to Appellant's election to take against Decedent's Will. Specifically, the Executrix averred that Appellant willfully abandoned and deserted Decedent, as well as physically abused her such that he forfeited his right to receive an elective share of Decedent's estate pursuant to 20 Pa.C.S.A. § 2106(a)(1).

On June 16, 2022, the Executrix filed a verified petition requesting the Orphans' Court set aside Appellant's request for an elective share of Decedent's estate. The Executrix requested the Orphans' Court schedule a hearing and dismiss Appellant's request for an elective share of the Will.

On July 6, 2022, Appellant filed preliminary objections. Therein, Appellant averred that, prior to Decedent's death, he filed a petition for support in the divorce action. He indicated that the petitions and agreements

- 2 -

filed in the divorce action reveal Decedent agreed she owed a duty of support to Appellant, and the trial court in the divorce action entered an order of support in favor of Appellant.

Appellant alleged the Executrix's June 16, 2022, verified objections to his election against the estate were legally deficient and did not state a cause of action upon which relief could be granted. Specifically, Appellant alleged the petition failed to establish forfeiture or willful abandonment.

On August 2, 2022, the Executrix filed an amended petition requesting the Orphans' Court dismiss Appellant's request for an elective share of Decedent's estate. Therein, the Executrix averred that Appellant engaged in a course of conduct, including excessive consumption of alcohol, physical abuse, and emotional abuse, throughout substantial portions of his and Decedent's marriage. The Executrix averred that the physical abuse resulted in bruises to Decedent and culminated in an incident at a resort on December 8, 2018, where Appellant brandished a knife. Appellant and Decedent did not reside together after December 8, 2018. They remained separated with Decedent living in Pennsylvania and Appellant living in Florida.

The Executrix averred Appellant filed for divorce on January 19, 2019, and he never attempted reconciliation with Decedent. The Executrix averred that, over Decedent's objections, the trial court granted alimony *pendente lite* to Appellant. The Executrix noted that Appellant purchased real estate in Florida in 2020 as a "single man," and he filed his income taxes as "single."

Thus, the Executrix averred Appellant forfeited his right to receive an elective share of Decedent's estate pursuant to 20 Pa.C.S.A. § 2106(a)(1).

On August 22, 2022, Appellant filed preliminary objections to the Executrix's amended petition averring the petition failed to allege sufficient facts to establish financial forfeiture, and, thus, any claim by the Executrix that Appellant forfeited his elective rights was without merit. The parties filed briefs in support of their respective positions, and by opinion and order filed on September 30, 2022, the Orphans' Court denied Appellant's preliminary objections. On October 21, 2022, Appellant filed an answer with new matter to the Executrix's amended petition, and on November 21, 2022, the Executrix filed an answer to the new matter.

On July 11, 2023, the Orphans' Court held a special relief hearing. The Executrix testified that Decedent was her paternal aunt, and they had a close relationship. N.T., 7/11/23, at 5. The Executrix explained that, when Decedent was alive, she spent time with Decedent "[a]t least once a week if not more." *Id.* at 6. She noted that she and Decedent "usually had Sunday dinners." *Id.* The Executrix confirmed that Decedent died on February 16, 2021, and her death was unexpected. *Id.* at 7.

The Executrix testified that, on December 8, 2018, Decedent and Appellant were on vacation in Florida when they had "some sort of fight at their hotel room[, and]…security was called[.]" *Id.* at 8. When Decedent returned to Pennsylvania after this incident, the Executrix observed a bruise

on Decedent's shoulder. *Id.* at 9. The Executrix testified that, during Decedent's and Appellant's marriage, before they separated, the Executrix "observed [Decedent] being upset with [Appellant]. She observed [Appellant] being intoxicated a lot, which caused [Decedent] stress." *Id.* The Executrix testified that, after Appellant and Decedent separated, Appellant did not contact her or discuss reconciling with Decedent. *Id.* at 13.

The Executrix testified that, after Decedent died, she contacted Appellant to thank him for releasing Decedent's body to the Executrix and for permitting cremation. *Id.* at 11. The Executrix noted that, in July of 2021, on what would have been Decedent's birthday, the family had a celebration of life service; however, Appellant neither assisted with the arrangements for the service nor attended the service. *Id.* He did not send a card to the family or flowers to the service. *Id.* at 12. He never asked where Decedent's ashes were being kept. *Id.* She noted that she is now living in Decedent's residence, and Appellant has not visited the residence since Decedent's death. *Id.* at 14.

The Executrix testified that, per Decedent's Will, it was her desire that Appellant not inherit from her. *Id.* She confirmed that, at the time of Decedent's death, she and Appellant were engaged in divorce proceedings and separated from one another. *Id.* During their separation, Appellant neither visited Decedent's home nor assisted in taking care of the home. *Id.* Decedent paid people to mow the lawn, shovel snow, and make household

repairs. *Id.* Although the Executrix and Decedent were close, Appellant never contacted the Executrix to find out how Decedent was doing when she was alive. *Id.* at 15.

On cross-examination, the Executrix testified that, when Decedent was alive, she "frequently" drank alcohol to excess. *Id.* However, "[s]he always had her affairs in order. She always took care of her business first." *Id.* The Executrix admitted Decedent's death was attributed to her falling and losing too much blood. *Id.* at 16. It is uncertain whether alcohol played a contributing role in Decedent's death. *Id.*

On redirect examination, the Executrix testified that Decedent never went to rehab for alcohol, and on recross-examination, she indicated that, to her knowledge, it was never recommended by any professional that Decedent go to rehab. *Id.* at 17-18.

Wendy Lee Worl-Phomsouvanh testified she used to live in Hawaii, and she met Decedent, along with Appellant, in approximately 2002. *Id.* at 23. In 2009, Ms. Worl-Phomsouvanh moved to Florida, and she maintained her friendship with Decedent and Appellant. *Id.* She noted that, prior to Decedent's and Appellant's separation, they would stay with her in Florida for a week or so each year. *Id.* at 23-24.

Ms. Worl-Phomsouvanh testified that, in December of 2018, Decedent and Appellant planned to visit some of the attractions in Orlando, Florida, and then they were going to stay with her for a week. *Id.* at 24. However, on

December 8, 2018, Decedent called her, and she was crying. *Id.* at 25. Decedent told her that she "needed to leave" the resort, and Ms. Worl-Phomsouvanh heard "yelling in the background." *Id.* Decedent then arrived at Ms. Worl-Phomsouvanh's house without Appellant, and she stayed for approximately five days. *Id.* Decedent was "very upset" during this time. *Id.*

Appellant testified that he currently resides in Florida, and he has resided there for two and one-half years. *Id.* at 27. Prior to his marriage to Decedent, he lived full-time in Maui, Hawaii, which is where he met Decedent, who was living part-time in Hawaii. *Id.* Decedent was a widow, and she had inherited her late husband's house in Pennsylvania, along with a stock portfolio. *Id.* at 28-29. Decedent "asked [Appellant] if he would like to live in Pennsylvania six months out of the year and Maui six months out of the year[.]" *Id.* at 28. "[I]t sounded pretty good to [Appellant]." *Id.* Accordingly, the couple married in December of 2001, and they commenced living part-time in Hawaii and part-time in Pennsylvania. *Id.* at 27-28.

Appellant admitted that Decedent's house in Pennsylvania belonged to Decedent as pre-marital property, and they stayed in this house during six months each year. *Id.* at 28. Appellant indicated that, with inheritance money he received from the death of his mother, he purchased an acre of land in Hawaii; however, he and Decedent never lived on the land. *Id.* at 29.

- 7 -

During the six months they lived in Hawaii each year, they stayed in different rentals and not in any place that either one of them owned. *Id.*

Appellant testified that he and Decedent were married for quite some time, and on December 6, 2018, they traveled with Decedent's five-year-old great-nephew from Pennsylvania to Florida to vacation in a condominium for four days. *Id.* at 30. Appellant testified that their plane out of Pennsylvania was delayed for six hours, and he and Decedent consumed a lot of alcohol while they waited for their flight to Florida. *Id.* at 31. During the flight, in addition to continuing to drink alcohol, Decedent "popped a Xanax." *Id.* at 32.

Appellant testified they arrived at the condominium in Florida on December 6, 2018, and on December 7, 2018, they went to Universal Studios. *Id.* However, Decedent's great-nephew did not enjoy himself, and he was afraid when they went on the Spiderman ride. *Id.* After only an hour and a half, Decedent declared they should leave the amusement park. *Id.* Appellant admitted he was "upset" because they had spent a lot of money to get into Universal Studios. *Id.* at 34. Appellant testified that, back at the condominium, they swam in the pool and consumed alcohol; however, he was still upset about leaving the amusement park early. *Id.*

Appellant indicated that, on December 8, 2018, he woke up and discovered Decedent was sleeping on the couch. *Id.* He testified he went into the kitchen to cut fruit for breakfast, and he and Decedent "got into a

heated argument." *Id.* at 36. Appellant admitted he was still upset from the day before because he believed Decedent "ruined" the day at the amusement park by insisting they leave early. *Id.* at 37. Appellant testified that, during the argument, Decedent took off her wedding ring, "slammed it on the table," and declared she "wanted a divorce." *Id.* at 38. In response, Appellant continued to argue and then went into the bedroom. *Id.*

At approximately 10:30 a.m., Decedent left the condominium with her great-nephew and went to Ms. Worl-Phomsouvanh's house in Florida. *Id.* at 38-39. Appellant remained at the condominium for the remaining day or two of the rental agreement. *Id.* He then flew back to Pennsylvania and stayed in a hotel. *Id.* at 39. He asked Decedent if he could come back to Decedent's Pennsylvania house to retrieve his belongings, and Decedent would not allow him back into the home. *Id.* He asked Decedent if he could have one of the cars so that he could drive back to Florida, and Decedent "signed over the Chrysler convertible" to him; however, she would not allow him to stay on the automobile insurance policy. *Id.* at 40. Appellant admitted that, soon after he returned to Florida with the Chrysler, he "got into an accident" and went to a detox center. *Id.* at 51.

Appellant noted that, when Decedent signed the Chrysler over to him, the transaction occurred at the Pennsylvania Department of Motor Vehicles because she would not allow him back into the Pennsylvania home. *Id.* However, he testified that, after Decedent signed the car over to him, they

traveled back to the Pennsylvania home. *Id.* Although Decedent would not allow him inside of the home, she went inside and retrieved a suitcase filled with his clothes. *Id.* Appellant testified Decedent gave him the suitcase, gave him a hug, and said she still wanted to be "friends." *Id.* Appellant testified he said that they could still be friends; however, he immediately hired a divorce attorney because Decedent wouldn't let him back into the Pennsylvania house. *Id.* He filed for divorce and sought spousal support approximately one month later, on January 19, 2019. *Id.*

Appellant testified that, in the divorce action, the domestic relations trial court entered an order of support for $178.83 in his favor on April 25, 2019. *Id.* at 42. Further, Decedent was ordered to provide medical insurance coverage for Appellant. *Id.* Appellant testified that he was a cook in restaurants; however, at the time of the divorce action, he was unemployed but looking for employment. *Id.* at 43. Appellant indicated the domestic relations trial court held him to an earning capacity. *Id.*

Appellant testified that "by agreement of the parties" the recommended order of April 25, 2019, was entered as a final order on August 21, 2019. *Id.* Also, this final order indicated that, effective August 1, 2019, Decedent was to pay Appellant $478.00 per month in alimony *pendente lite*. *Id.* However, at some point, Appellant filed a petition for modification of support, and his "support went up to $822.51 a month." *Id.* at 48. Also, at this time, Decedent was no longer ordered to provide medical insurance coverage for Appellant;

but rather, since he was now employed, Appellant was required to provide medical insurance for himself. *Id.* at 48-49.

Appellant indicated that, after he and Decedent came to an agreement regarding his spousal support, they began "addressing other matters in the divorce." *Id.* at 44. Appellant indicated he arranged to have Decedent's house in Pennsylvania appraised; however, on November 2, 2020, Decedent's attorney sent an email to Appellant's divorce attorney asking why an appraiser was contacting Decedent. *Id.* at 49.

Appellant testified that, during his marriage to Decedent, he and Decedent both used alcohol every day. *Id.* at 51. He admitted that he went into rehab several times during his marriage; however, he could not convince Decedent to go into rehab with him. *Id.* at 52. He testified that, on several occasions prior to the separation, he asked Decedent to go to counseling, but she refused. *Id.* Appellant indicated that, after he served Decedent with divorce papers in January of 2019, he and Decedent had no further communication outside of their lawyers. *Id.* at 53. He admitted that he knew about the celebration of life service for Decedent; however, he did not attend because it was too costly for him to travel from Florida to Pennsylvania. *Id.*

On cross-examination, Appellant admitted that, during the divorce proceedings, Decedent questioned his entitlement to support. *Id.* at 54. Appellant testified that, although he filed the divorce action in January of 2019, he did not want a divorce. *Id.* at 56. He admitted the divorce was

"dragging on" for more than two years after he and Decedent separated, and during this time, he continued to collect support/alimony *pendente lite* from Decedent. ***Id.*** Appellant admitted that for the last two years of his marriage to Decedent, prior to the separation, he was unemployed. ***Id.*** at 60. He began working again in May or June of 2019, after he and Decedent separated. ***Id.*** at 68.

Appellant admitted that, during his marriage to Decedent, he titled the land in Hawaii jointly to himself and Decedent. ***Id.*** at 58. He admitted that Decedent mortgaged her home in Pennsylvania to help Appellant purchase the property, and, thus, Appellant did not purchase the property in Hawaii solely with money from an inheritance. ***Id.***

Regarding the December 8, 2018, argument, Appellant testified he "did not remember" if he pushed Decedent against the wall; however, he admitted Decedent called the resort's security, and they had a "heated argument." ***Id.*** at 61, 66. He admitted resort security generated an incident report wherein they indicated Appellant was "intoxicated." ***Id.*** Appellant admitted he has no letters or other items suggesting he asked Decedent to go to counseling or otherwise sought to "save his marriage" after December 8, 2018. ***Id.*** at 67.

He admitted that, after he separated from Decedent, he did not have conversations with Decedent, he did not send her any gifts, and he did not offer to help take care of the house in Pennsylvania. ***Id.*** at 70. After Decedent

- 12 -

signed over the Chrysler to him, he did not return to Pennsylvania. *Id.* All communication occurred between the attorneys. *Id.* at 68.

He testified that, during the divorce proceedings, he and Decedent sold the Hawaii land and divided the proceeds from the sale. *Id.* at 70. He used his share to buy himself a home in Florida approximately two years ago, and he did not use any of his share for upkeep of the Pennsylvania home. *Id.* He admitted the deed to the Florida home identifies him as "a single man." *Id.* at 71. He further admitted he signed a mortgage for his Florida home on December 30, 2020, and he identified himself as "unmarried." *Id.* at 72. He testified he was "one person buying the house" for himself. *Id.* at 71.

Appellant admitted that, during his marriage to Decedent, he went into rehab three times. *Id.* at 74. He also admitted that, after Decedent's death, he kept an overpayment of alimony *pendente lite*, which totaled over $900.00. *Id.* at 75. Appellant further admitted that he received $15,000.00 from a life insurance policy after Decedent died. *Id.* at 78. Appellant admitted he did not help with any arrangements after Decedent died. *Id.* However, he contacted the Executor because he needed a copy of Decedent's death certificate for Social Security purposes. *Id.* at 77.

On redirect examination, Appellant admitted Decedent did not know that he was purchasing a home in Florida in December of 2020. *Id.* at 81. He reiterated that they had no communication after he filed for divorce. *Id.*

The Executrix was recalled to the stand. She indicated that, although Decedent drank alcohol, she took care of the house, Appellant, and her great-nephew prior to the separation. *Id.* at 87. She noted that, after the separation, Appellant never asked to see the great-nephew. *Id.*

After the hearing, the Executrix and Appellant filed briefs in support of their respective positions. By opinion and order entered on January 2, 2024, the Orphans' Court granted the Executrix's amended petition, dismissed Appellant's notice of election to take against the Will, and directed the forfeiture of his spousal interest to an elective share of Decedent's estate. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Involved" (verbatim):

(1) Did Appellant forfeit his right to inherit from his deceased spouse due to Appellant's alleged failure to perform the "duty to support" Decedent for at least one year prior to her death pursuant to the Forfeiture Statute?

(2) Did Appellant forfeit his right to inherit from his deceased spouse for willfully and maliciously deserting Decedent for at last [*sic*] one year prior to her death pursuant to the Forfeiture Statute?

Appellant's Brief at 4 (suggested answers omitted).

Appellant's issues are intertwined. Appellant contends that, since he was still married to Decedent when she died (*i.e.,* he was a surviving spouse), he is entitled to an elective one-third of the property passing from Decedent

- 14 -

by will or intestacy, even though Decedent specifically excluded him from her Will. Appellant contends the Orphans' Court's holding that he forfeited his spousal share of his deceased wife's estate is not free from legal error or supported by competent and adequate evidence in the record. Specifically, he contends the Orphans' Court erred in finding that for one year or more he (1) willfully neglected or refused to perform a duty of support to Decedent or (2) willfully and maliciously deserted Decedent. We conclude the Orphans' Court neither erred nor abused its discretion in holding Appellant forfeited his right to Decedent's estate because he willfully and maliciously deserted Decedent.[2]

Our standard when reviewing an Orphans' Court's findings is deferential.

> The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

> When the [Orphans'] Court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. It is not sufficient to persuade the appellate court that it might have reached a different conclusion

_____

[2] Accordingly, it is unnecessary for us to address Appellant's remaining issue, *i.e.*, whether he forfeited his right to Decedent's estate because he willfully neglected or refused to perform a duty of support to Decedent.

if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused. A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous....If the lack of evidentiary support is apparent, reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law. Nevertheless, we will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record.

*In re Jerome Markowitz Trust*, 71 A.3d 289, 297–28 (Pa.Super. 2013) (citation omitted).

"When the Orphans' Court arrives at a legal conclusion based on statutory interpretation, our standard of review is *de novo* and our scope of review is plenary." *In re Estate of Fuller*, 87 A.3d 330, 333 (Pa.Super. 2014) (citation omitted).

"The death of a spouse during the pendency of a divorce proceeding abates the divorce action and any and all claims for equitable distribution." *In re Estate of Cochran*, 738 A.2d 1029, 1031 (Pa.Super. 1999) (citing *Myers v. Myers*, 580 A.2d 384, 385 (Pa.Super. 1990)). Although "the Probate, Estates, and Fiduciaries Code ('the Probate Code') contains substantial provisions designed to ensure the fair distribution of the marital estate upon the death of one spouse," the Probate Code provides that a surviving spouse may forfeit his or her right or interest to the estate of the

other spouse in certain circumstances. *In re Estate of Cochran*, 738 A.2d at 1031 (quotation omitted). In cases where a decedent died with a will that disinherits a surviving spouse, Section 2208 of the Probate Code states that the surviving spouse will forfeit an elective share of the decedent's estate if he or she meets the criteria for forfeiture set forth in Section 2106 (relating to a decedent who died intestate).

The relevant section of the Probate Code provides as follows.

**§ 2106. Forfeiture**

**(a) Spouses share.**—

(1) A spouse who, for one year or upwards previous to the death of the other spouse, has willfully neglected or refused to perform the duty to support the other spouse, or who for one year or upwards has willfully and maliciously deserted the other spouse, shall have no right or interest under this chapter in the real or personal estate of the other spouse.

20 Pa.C.S.A. § 2106(a)(1) (bold in original).

In other words, relevantly, a surviving spouse forfeits his right or interest in the estate of his deceased spouse by (1) willfully neglecting or refusing to perform the duty to support the decedent for one year or more prior to the decedent's death, or (2) willfully and maliciously deserting the decedent for one year or more prior to the decedent's death. *See id.*

With respect to forfeiture by willful and malicious desertion, our courts have further provided that:

the mere fact of separation does not create a presumption of willful and malicious desertion. *In re Estate of Kostick*, 514 Pa. 591, 594, 526 A.2d 746,748 (1987). *See also In re Lodge's Estate*, 287 Pa. 184, 186, 134 A. 472, 473 (1926) ("Mere

- 17 -

separation is not desertion, there must be an actual abandonment of matrimonial cohabitation with intent to desert, willful and persisted in without cause."). Thus, where an allegation of desertion is based on separation, the party advocating forfeiture must prove there was a desertion without cause or consent of the other spouse. *In re Estate of Fisher*, 442 Pa. 421, 424, 276 A.2d 516, 519 (1971). However, once such a showing has been made, the parties' separation is presumed a willful and malicious desertion and the burden shifts to the surviving spouse to prove the contrary. *Id.*

*In re Estate of Cochran*, 738 A.2d at 1031 (internal quotes omitted). The nature of the deserting spouse's conduct, either before or after the separation, and the extent to which it is inconsistent with the marital relationship, is dispositive of whether the separation is a willful and malicious desertion within the meaning of the forfeiture statute. *Id.* at 1032. *See In re Crater's Estate*, 372 Pa. 458, 93 A.2d 475, 478 (1953) ("[W]here a separation has its inception in mutual consent of the parties, it becomes a willful and malicious desertion on the part of the spouse who thereafter is guilty of conduct violative of the marriage vows.").

Appellant contends he separated from Decedent with just cause or Decedent's consent such that desertion was not proven. He further contends that the mere fact he was the party who filed for divorce does not prove willful and malicious desertion.

In the case *sub judice*, in concluding the Executrix proved by competent evidence that Appellant willfully and maliciously deserted Decedent for one year or more prior to Decedent's death, the Orphans' Court relevantly indicated the following:

The [Orphans'] Court does not have a complete recitation of what occurred between Decedent and [Appellant] on December 8, 2018. However, [Appellant's] evasive and self-serving recollection exemplifies the reasons why the [Orphans'] Court finds [Appellant] not credible in his testimony.

What the [Orphans'] Court is sure of is that on December 8, 2018, Decedent and [Appellant], who both engaged in extensive alcohol abuse, had a heated argument that resulted in Decedent calling security from the resort where they were staying. Decedent chose to leave the condominium and seek asylum with Ms. Worl-Phomsouvanh. Decedent, before leaving, called Ms. Worl-Phomsouvanh. Ms. Worl-Phomsouvanh heard yelling in the background and allowed Decedent to stay with her instead of at the condominium. Decedent's bruise on her arm was photographed when she returned to Pennsylvania. Instead of denying any physical altercation, [Appellant] said he did not remember what took place….[Appellant] did not testify that he would never physically harm Decedent. [Appellant] said he did not remember if he pushed Decedent against a wall, but he certainly remembers that it was the Spiderman ride at Universal Studios Amusement Park, which the day before frightened Decedent's great-nephew and caused the parties to leave the amusement park prematurely.

[Appellant] did not present copies of any text messages he purportedly sent to Decedent. [Appellant] did not present phone records demonstrating any calls he made to Decedent. [Appellant] was unable to provide copies of any correspondence he sent to Decedent during their separation….[Appellant] did not demonstrate any evidence of an attempt to reconcile or seek couples counseling with Decedent [after the separation].

[Appellant] testified that he had the ability to work anywhere. Yet, within weeks after he and Decedent separated, he moved out of Pennsylvania after securing a vehicle and hiring an attorney to file for divorce.

[Appellant] claimed he did not want to get divorced. Oddly then, he was the one who filed for divorce approximately 37 days after the fight that occurred on December 8, 2018.

\*\*\*

Following the separation, [Appellant] bought a house in Florida that was titled solely in his own name and the related documentation identifies [Appellant] as a "single man." [He

admits he did not tell Decedent that he purchased the house in Florida.]

\*\*\*

In the instant case, [Appellant] was virtually absent from Decedent's life from the time of their argument on December 8, 2018.

\*\*\*

The [Orphans'] Court…concludes that, based upon the totality of the circumstances, [Appellant] forfeited any interest he may have had as Decedent's surviving spouse because he…willfully and maliciously deserted Decedent.

Orphans' Court Opinion, filed 1/2/24, at 11-14 (citations to record omitted).

We find no abuse of discretion or error of law. In examining Appellant's conduct before and after separation, we agree with the Orphans' Court that it is inconsistent with the marital relationship and demonstrates the separation is a willful and malicious desertion within the meaning of the forfeiture statute. *See In re Estate of Cochran*, *supra*.

For example, on December 8, 2018, which is the last time Appellant and Decedent were together as a couple, they had a heated argument while on vacation in Florida. The argument originated with Appellant, who was intoxicated, being upset because the couple had left an amusement park early the day before. Decedent called resort security, fled to a friend's house in Florida, and returned a few days later to her home in Pennsylvania, where the Executrix observed a bruise on Decedent's shoulder.

Thereafter, Appellant returned briefly to Pennsylvania, and upon request, Decedent gave him a vehicle. Although she would not allow him to

go into the Pennsylvania home, she gave him a suitcase containing his clothes. In response, Appellant immediately moved to Florida without attempting reconciliation with Decedent or asking her to go to counseling. Appellant filed a divorce action on January 19, 2019; he had no further communication with Decedent; he made no inquiries about Decedent; he did nothing to assist with the upkeep of the Pennsylvania house; he never attempted to return to the Pennsylvania home; and he directed his attorney to handle all matters. Appellant essentially "washed his hands" of the marriage. Further, Appellant, without telling Decedent, purchased his own home in Florida as "a single man" as soon as he had the funds to do so in December of 2020. N.T., 7/11/23, at 71.

Based on the aforementioned, the Orphans' Court did not err in concluding Appellant willfully and maliciously deserted Decedent more than one year prior to Decedent's death. Appellant's conduct was wholly inconsistent with the marital relationship. **See In re Lodge's Estate**, **supra**.

Moreover, it is noteworthy that, contrary to Appellant's assertion, the fact Decedent fled from Appellant on December 8, 2018, and then would not allow him into the Pennsylvania home approximately one week later to retrieve his clothes, does not demonstrate that she consented to the separation but was evidence of her reasonable response to a volatile and dangerous situation. **See In re Estate of Cochran**, **supra** (recognizing that the wife's action of filing a protection from abuse petition, resulting in the

husband being removed from the home, was not evidence she consented to a separation but was merely a response to a volatile and dangerous situation that rendered her choice of remedy the only rational course of action). Moreover, Appellant's divorce action did not raise any claims for the fault-based dissolution of the marriage. As the Orphans' Court determined, the evidence did not demonstrate that Appellant's failure to eventually return to the Pennsylvania residence or to contact Decedent were motivated by any cause or were endorsed with the consent of Decedent. Indeed, when Decedent died, Appellant did not attend her celebration of life service or even send flowers.

In view of the evidence, we conclude the Orphans' Court properly held that Appellant deserted Decedent for more than one year without cause or consent, and consequently, he forfeited his share of Decedent's estate. That is, there was an actual abandonment by Appellant of matrimonial cohabitation with intent to desert, willful and persisted in without cause. ***See In re Lodge's Estate***, ***supra***. Accordingly, we affirm the Orphans' Court's order, which granted the Executrix's amended petition, dismissed Appellant's notice of election to take against the Will, and directed the forfeiture of his spousal interest to an elective share of Decedent's estate.

Order Affirmed.

- 22 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 9/20/2024